**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

RANDY HANCE,

                       Plaintiff,

      v.

CAROLYN M. COLVIN, COMMISSIONER
OF SOCIAL SECURITY,

                     Defendant.

8:15-CV-1362
(CFH)

_____

| APPEARANCES: | OF COUNSEL: |
|---|---|
| Office of Mark A. Schneider<br>57 Court Street<br>Plattsburgh, New York 12901<br>Attorneys for Plaintiff | MARK A. SCHNEIDER, ESQ. |
| Social Security Administration<br>Office of Regional General Counsel,<br>Region II<br>26 Federal Plaza, Rm. 3904<br>New York, New York 10278<br>Attorneys for Defendant | DAVID B. MEYERS, ESQ. |

**CHRISTIAN F. HUMMEL,**
**U.S. MAGISTRATE JUDGE**

**MEMORANDUM-DECISION AND ORDER**

      Plaintiff Randy Hance brings this action pursuant to 42 U.S.C. § 405(g) seeking

review of a decision by the Commissioner of Social Security ("Commissioner" or

"defendant") denying her applications for supplemental security income benefits ("SSI")

and disability insurance benefits.  Dkt. No. 1 ("Compl.").[1]  Plaintiff moves for a finding of

---

[1]  Parties consented to direct review of this matter by a Magistrate Judge pursuant to 28 U.S.C. §
636(c), FED. R. CIV. P. 73, Local Rule 72.2(b), and General Order 18.  Dkt. No. 5.

disability, and the Commissioner cross moves for a judgment on the pleadings.  Dkt. Nos. 12, 14.  For the following reasons, the determination of the Commissioner is remanded.

## I. Background

Plaintiff was born on March 26, 1969.  T at 121.  Plaintiff graduated from high school where he attended regular education courses.  Id. at 124.  Plaintiff is unmarried and lives with his mother and teenaged son.  Id. at 121, 123.  Plaintiff last worked as a truck driver.  Id. at 122.  Plaintiff left his job driving a tractor trailer in January 2012, after he had an aneurysm.  Id. at 125.  Plaintiff served in the Air Force from 1988 until 2008, when he obtained an honorable discharge.  Id. at 124.  Plaintiff worked as a pneudraulic system specialist.  Id.  Plaintiff has not looked for work since suffering from his aneurysm because he believes he will not find work he can do due to his physical limitations.  Id. at 125.  Plaintiff does not have a current driver's license because he "can't pass the eye exam to get it renewed."  Id. at 123.  Plaintiff protectively filed a Title II application for disability and disability insurance benefits, and a Title XVI application for supplemental security income on March 2, 2012.  T at 269-84.  Plaintiff alleged disability beginning on January 25, 2012.  Those applications were denied on August 24, 2012.  Id. at 175-82.  Plaintiff requested a hearing, and a hearing was held before Administrative Law Judge ("ALJ") Dale Black-Pennington, who concluded that plaintiff was not disabled.  Id. at 116-49;155-65.  The Appeals Council, following plaintiff's request for review, remanded for a new hearing, and a second hearing was held on

April 29, 2015.  Id. at 170-73; 31-114; 223.  In a decision dated June 1, 2015, the ALJ

again determined that plaintiff was not disabled.  Id. at 10-20.  Plaintiff's timely request

for review by the Appeals Council was denied, making the ALJ's findings the final

determination of the Commissioner.  Id. at 152-54.  Plaintiff commenced this action on

November 17, 2015.  Dkt. No. 1 ("Compl.").


## II. Discussion

### A.  Standard of Review

In reviewing a final decision of the Commissioner, a district court may not

determine de novo whether an individual is disabled.  See 42 U.S.C. §§ 405(g),

1383(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir.

1990).  Rather, the Commissioner's determination will only be reversed if the correct

legal standards were not applied, or it was not supported by substantial evidence.

Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987);  Berry v. Schweiker, 675 F.2d

464, 467 (2d Cir. 1982).  Substantial evidence is "more than a mere scintilla," meaning

that in the record one can find "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion.'"  Halloran v. Barnhart, 362 F.3d 28, 31 (2d

Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations

omitted)).   The substantial evidence standard is "a very deferential standard of review

. . . . [This] means once an ALJ finds facts, we can reject [them] only if a reasonable

factfinder would have to conclude otherwise."  Brault v. Soc. Sec. Admin., Comm'r, 683

F.3d 443, 448 (2d Cir. 2012) (internal quotation marks omitted).  Where there is

3

reasonable doubt as to whether the Commissioner applied the proper legal standards, the decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence. Martone v. Apfel, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (citing Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987)). However, if the correct legal standards were applied and the ALJ's finding is supported by substantial evidence, such finding must be sustained, "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citation omitted).

## B. Determination of Disability

"Every individual who is under a disability shall be entitled to a disability . . . benefit . . . ." 42 U.S.C. § 423(a)(1). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." Id. § 423(d)(1)(A). A medically-determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based on his or her age, education, and work experience. Id. § 423(d)(2)(A). Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques." Id. § 423(d)(3). Additionally, the severity of the impairment is "based [upon] objective medical facts, diagnoses or medical opinions inferable from

4

[the] facts, subjective complaints of pain or disability, and educational background, age, and work experience." Ventura v. Barnhart, No. 04-CV-9018 (NRB), 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based on 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.
>
> If he [or she] is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his [or her] physical or mental ability to do basic work activities.
>
> If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity.
>
> Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work.
>
> Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry, 675 F.2d at 467 (spacing added). The plaintiff bears the initial burden of proof to establish each of the first four steps. DeChirico v. Callahan,134 F.3d 1177, 1179-80 (2d

5

Cir. 1998) (citing <u>Berry</u>, 675 F.2d at 467).  If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere.  <u>Id.</u> at 1180 (citing <u>Berry</u>, 675 F.2d at 467).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision."  <u>Barringer v. Comm'r of Soc. Sec.</u>, 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing <u>Ferraris v. Heckler</u>, 728 F.2d 582, 587 (2d Cir. 1984)).  However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner where the record contains substantial support for the ALJ's decision.  <u>See</u> <u>Yancey v. Apfel</u>, 145 F.3d 106, 111 (2d Cir. 1998).  If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]."  <u>Rosado v. Sullivan</u>, 805 F. Supp. 147, 153 (S.D.N.Y. 1992).  The Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review."  <u>Valente v. Sec'y of Health & Human Servs.</u>, 733 F.2d 1037, 1041 (2d Cir. 1984).

## C.  ALJ Decision

Applying the five-step disability sequential evaluation, the ALJ determined that plaintiff had not engaged in substantial gainful activity since January 25, 2012, the

alleged onset date. T at 16. The ALJ found at step two that plaintiff had the severe

impairments of status post basilar tip aneurysm with subarachnoid and interventricular

hemmorhage, requiring coil embolization. Id. At step three, the ALJ determined that

plaintiff did not have an impairment or combination of impairments that met or medically

equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P,

Appendix 1. Id. at 19. The ALJ then concluded that plaintiff retained the residual

functional capacity ("RFC") to:

> perform light work, as defined in 20 CFR 404.1567(b) and
> 416.967(b), except that the claimant must avoid vibrations,
> unprotected heights, and heavy moving mechanical parts.
> He must avoid repetitive twisting and bending; cannot
> balance, climb ladders, ropes or scaffolds; requires handrails
> to climb ramps or stairs; can frequently, but not repetitively
> or continuously, handle; and can occasionally feel with the
> left hand. The claimant is unable to read from a computer
> screen, but can read written material occasionally. The
> claimant is able to walk for 30 minute intervals for six hours
> during the course of an eight hour workday; is able to stand
> for 45 minute intervals for six hours during the course of an
> eight hour workday; and is able to sit for six hours during the
> course of an eight hour workday.

Id. at 19-20.

At step four, the ALJ determined that plaintiff is unable to perform any past

relevant work. T at 23. Considering plaintiff's RFC, age, education, and work

experience, together with the Medical-Vocational Guidelines, the ALJ further concluded

that there were jobs existing in the national economy that plaintiff was able to perform.

Id. The ALJ considered the testimony of a vocational expert ("VE"), and concluded that,

pursuant to SSR 00-4p, the VE's testimony was consistent with the Dictionary of

Occupational Titles ("DOT"). Id. Thus, the ALJ concluded that plaintiff could perform

the jobs of hsopital television rental clerk and parking lot cashier. Id. at 24. Therefore, the ALJ determined that plaintiff "has not been under a disability, as defined under the Social Security Act, from January 25, 2012, through the date of the decision. Id.

### D. Arguments

Plaintiff contends that the Commissioner's determination is not based on substantial evidence because: (1) the ALJ failed to comply with the Appeals Council remand order by declining to obtain a consultative examination on remand; (2) the ALJ gave "too much weight to her consulting expert and not enough weight to the treating sources"; (3) the Appeals Council failed to consider new and relevant medical evidence submitted post-hearing decision; (4) the ALJ erred by failing to consider plaintiff's excellent work history in determining plaintiff's testimony regarding his limitations to be not credible; (5) the ALJ erroneously concluded that plaintiff failed to comply with medical treatment; and (6) the ALJ provided an inaccurate RFC to the VE. See generally Dkt. No. 12.[2] Defendant argues (1) substantial evidence supports the ALJ's determination; (2) the post-decision evidence submitted to the Appeals Council did not provide a basis to change the ALJ's determination; (3) the ALJ properly determined plaintiff's claims regarding his limitations were less than fully credible; and (4) the ALJ properly relied on the VE's testimony in providing hypotheticals representative of plaintiff's abilities and limitations. See generally Dkt. No. 14.

_____

[2] Plaintiff's counsel requested, and the Court granted, permission to file a brief in excess of twenty-five pages, but no more than forty-five pages. Dkt. Nos. 10, 11.

## 1. Christine O'Neill, MMSC, PA-C

Plaintiff contends that the ALJ did not give proper weight to the opinion of Christine O'Neill, MMSC, PA-C. Dkt. No. 12 at 26-34. Plaintiff also argues that the ALJ failed to comply with the Appeals Council's remand order insofar as he failed to "give further consideration" to Ms. O'Neill's opinion or address specific findings in Ms. O'Neill's proposed RFC that the Appeals Council concluded were not addressed in his earlier determination. Id. at 26-27.

### a. Weight given to Ms. O'Neill's Opinion

Although the ALJ did not explicitly state the weight he accorded to Ms. O'Neill's opinion, he provided that he "does not find that the opinion of Ms. O'Neill is entitled to any probative value[,]" suggesting that he accorded her opinion no weight. T at 21. Ms. O'Neill completed an MSS on September 3, 2013. Id. at 909-13. Ms. O'Neill reported plaintiff's diagnoses as ruptured cerebral aneurysm and ischemic stroke due to vasospasm.[3] Id. at 909. She opined that plaintiff's prognosis was "fair." Id. Plaintiff's symptoms were "left arm coordination dysfunction," "gait imbalance," and "diplopia."[4] Id. Plaintiff's "clinical findings and objective signs findings" were "disconjugate gaze, left

---

[3] Vasospasm is "[c]ontraction or hypertonia of the muscular coats of the blood vessels, SYN synonymous] angiohypertonia, angiospasm." STEDMAN'S MEDICAL DICTIONARY 2093 (28th ed. 2006).

[4] Diplopia, or double vision, "is the perception of 2 images of a single object." THE MERCK MANUAL OF DIAGNOSES AND THERAPY 550 (19th ed. 2011).

arm [illegible], wide based gait with mild ataxia."[5]  Id.  For treatment, Ms. O'Neill

provided that plaintiff "must remain on aspirin to prevent in-stent[6] thrombosis" and that

the aspirin resulted in "no significant side effects."  Id.  Ms. O'Neill believed plaintiff's

impairments were expected to last at least twelve months, and that plaintiff was not a

malingerer.  Id. at 909-10.  Ms. O'Neill provided that plaintiff had depression which

affected his physical condition.  Id. at 910.  Further, she provided that plaintiff's

symptoms were "frequently" severe enough to interfere with concentration and attention

needed to perform even simple work tasks.  Id.   As for work stress, Ms. O'Neill

answered that plaintiff was "capable of low stress jobs," and as her reasoning for this

conclusion, she provided that plaintiff "has good insight into his condition, but will

become frustrated by his physical limitations."  Id.  She further provided that plaintiff

could sit for more than two hours at a time, and stand for thirty minutes at a time.  Id. at

910-11.

　　　Ms. O'Neill opined that plaintiff could sit for at least six hours in an eight-hour

work day, and stand or walk for about two hours in an eight-hour work day.  T at 911.

Plaintiff will need to include periods of walking around during an eight-hour work day,

and will need to walk every thirty minutes for ten minutes at a time.[7]  Id.  Ms. O'Neill

---

[5]  Ataxia is "[a]n inability to coordinate muscle activity during voluntary movement; most often results from disorders of the cerebellum or posterior columns of the spinal cord; may involve the limbs, head, or trunk.  SYN [synonymous] ataxy, incoordination."  STEDMAN'S MEDICAL DICTIONARY 172 (28th ed. 2006).

[6]  This is somewhat illegible, but it appears to state "in-sent thrombosis."

[7]  Under Ms. O'Neill's response that plaintiff must walk every thirty minutes for ten minutes, plaintiff must walk twenty minutes per hour.  In an eight-hour work day, this would amount to 160 minutes of walking or 2.67 hours of walking per work day.  T at 911.

believed plaintiff would need unscheduled breaks throughout the work day, but the frequency of such breaks is "unknown" to her because plaintiff "has not worked since his stroke." Id. Ms. O'Neill answered that plaintiff did not need a cane or assistive device to stand or walk. Id. Plaintiff could occasionally lift ten pounds or less, but could never lift over ten pounds. Id. Plaintiff could rarely look down, turn his head left or right, or look up. Id. at 912. However, plaintiff could frequently hold his head in a static position. Id. Plaintiff could never climb ladders, but could occasionally twist, stoop/bend, or climb stairs. Id. Plaintiff had unlimited ("100%") use of his right hand, fingers, and arm, but no use ("0%") of his left hand, fingers, and arm. Id. Ms. O'Neill predicted that plaintiff would miss more than four days of work per month. Id. Finally, Ms. O'Neill explained that plaintiff's "visual, balance and coordination deficits make it impossible for him to return to his previous careers in truck driving and aircraft maintenance. It will be difficult for him to find full time work that he can tolerate." Id. at 913.

Although plaintiff starts out his argument by properly recognizing that a physician's assistant may not determine the existence of an impairment, but may be relied on to support the severity of an impairment, plaintiff then cites 20 C.F.R. § 404.1527, contending that the regulation "unequivocally means that the findings of a medical source are medical opinions under the treating physician rule." Dkt. No. 12 at 26-27. The quoted portion of the regulation explicitly provides that it applies to statements from *acceptable* medical sources. See 20 C.F.R. § 404.1527(a)(1). The statute itself, including the portion partially quoted by plaintiff in his brief, defines

11

"medical opinions" as "statements from physicians." Id. (effective until Mar. 27, 2017) ("Medical opinions are statements from physicians and psychologists or other acceptable medical sources"). The statute defines treating source as "your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or had, an ongoing treatment relationship with you." Id. § 404.1527(a)(2).

To the extent plaintiff seeks to apply 20 C.F.R. § 404.1527 to Ms. O'Neill's opinion, such argument must fail, as a physican's assistant is not an acceptable medical source, and, thus, is not a "treating source." Rather, a PA is an "other source." 20 C.F.R. § 404.1513(d) ("In addition to evidence from the acceptable medical sources listed in paragraph (a) of this section, we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work. Other sources include, but are not limited to [] Medical sources not listed in paragraph (a) of this section (for example . . . physician's assistants . . . ."). Although, sandwiched between his discussion of the treating physician rule/20 C.F.R. 404.1528, plaintiff cites Social Security Ruling 06-03p, which discusses consideration of the opinion of a medical source that is not an acceptable medical source, as well as one case, Kohler v. Astrue, 546 F.3d 260, 268-69 (2d Cir. 2008), he provides no analysis for why Ms. O'Neill's opinion should be given greater weight than the opinions of acceptable medical sources. Dkt. No. 12 at 27-28. Plaintiff cites a substantial amount of case law – five pages worth – addressing treating sources and the treating physician's rule, but does not refer to single acceptable medical source to whom the ALJ was required to accord

controlling weight, but failed to do so.  Instead, plaintiff argues that the ALJ erred in

according substantial weight to Dr. Cloninger and no weight to Ms. O'Neill. Dkt. No. 12

at 26-30.  However, as discussed, these regulations and case law regarding the treating

physician's rule does not apply to Ms. O'Neill's opinion.

     The only other acceptable medical source that plaintiff discusses in this section is

that of consultative examiner Dr. David Welch.[8]  Dkt. No. 12 at 33.  Plaintiff argues that

the ALJ "erred by not giving enough credit to the report of his own examining consultant

Dr. David Welch."  Id.  Plaintiff notes that Dr. Welch concluded that plaintiff experienced

difficulty with right-sided gaze, had "a bit of difficulty with fine motor skills in the left hand

more than the right" and concluded that it was "premature to make a final decision" on

plaintiff's abilities and that "[a] follow up assessment would be appropriate in about 3

more months."  Id.  Plaintiff argues that Dr. Welch's report "regarding Mr. Hance's vision

and left arm and hand impairments support[s] O'Neill's later findings and conclusions."

Id.  Although Dr. Welch's findings do support that plaintiff had some difficulty "with right-

sided gaze," and, thus, may have some trouble with his eyes, his findings do not

---

[8]  The consultative neurology examination with Dr. David Welch occurred on May 9, 2012.  T at
627-28.  Dr. Welch noted that plaintiff had a "slightly wide-based gait pattern and does slightly favor his left
lower extremity" Id. at 628.  Plaintiff "had little difficulty balancing on the right foot but was not able to stand
on the left for more than a couple of seconds."  Id.  Plaintiff's balance "became a significant issue" "when
trying to walk in a tandem fashion."  Id.  Plaintiff could walk on his toes and heels.  Id.  Plaintiff had "good
strength" in all extremities, "close to 4/5."  Id.  His reflexes on his left side were "slightly hyperactive but
without any evidence of clonus[,] reflexes on the right are normal."  Dr. Welch found "no evidence of
significant sensory deficits."  Id.  Plaintiff had "very slight facial weakness left side more than right but his
movements were symmetrical."  Id.  Plaintiff had "some difficulty with right-sided gaze otherwise
extraocular eye movements are normal."  Id.  Plaintiff further "demonstrated good gross motor
coordination skills but had a little bit of difficulty with fine motor skills in the left hand more than the right."
Id. at 628.  Dr. Welch noted that plaintiff was "making a good recovery," but because his MRI "shows
evidence of another aneurysm and a possible recurrence of the first" which "likely" indicated "additional
surgical intervention," it was "premature to make a final determination about [plaintiff's] abilities going
forward and a follow-up assessment or review of his medical records would be more appropriate in about
3 more months to make a more reasoned statement."  Id. at 828.

support the significant limitations found by Ms. O'Neill, as Ms. O'Neill concluded that plaintiff had no functional use of his left hand, whereas Dr. Welch noted only "a bit of difficulty" with fine motor skills.  Id. at 628.  Dr. Welch noted that plaintiff otherwise had "good strength through all for extremities," "no evidence of significant sensory defects," and "good gross motor coordination skills."  Id.  Thus, although Dr. Welch's report supports the *existence* of some issues with his vision (on the right) and fine motor skills, Dr. Welch did not report significant deficits in these fields.  Id.

Although a PA's opinion cannot be used to establish the existence of an impairment and it is not entitled to any "special weight," it can be relied on assessing the severity of a claimant's impairment, and may be entitled to "some weight" when there is a treatment relationship between the PA and the claimant.  See generally Zenzel v. Astrue, 993 F. Supp. 2d 146, 154 (N.D.N.Y. 2012) (citing 20 C.F.R. § 416.913(d)(1)).  However, although an ALJ must *consider* the opinion of a treating PA pursuant to SSR 06-03p, where the opinion of an unacceptable medical source or "other source," such as a PA, conflicts with, or is unsupported by, objective medical evidence, an ALJ may properly decline to accord it weight.  See generally Genier v. Astrue, 298 F. App'x 105, 108 (2d Cir. 2008).

Here, the Court finds that the ALJ provided the required reasoning for discounting Ms. O'Neill's opinion as to plaintiff's RFC.  The ALJ explained his assessment and weight provided to Ms. O'Neill's opinion in significant detail.  The ALJ accorded Ms. O'Neill's opinion no probative value.  Id. at 21.  In making this determination, the ALJ concluded that Ms. O'Neill's "assertions are speculative."  Id.

14

The ALJ concluded that her statement regarding plaintiff's difficulty finding full-time work that he could tolerate "is within the purview of a vocational expert, not a physician's assistant." Id.[9] As for Ms. O'Neill's finding that plaintiff would likely miss more than four work days per month, the ALJ concluded that there was "no credible basis" for this determination. Id. The ALJ noted that, despite Ms. O'Neill's opinion that plaintiff had "no functional use" of his left fingers, hand, and arm, consultative examiner "Dr. Welch observed that the claimant displays good gross motor skills, but has a little difficulty with fine motor skills affecting the non-dominant left hand." Id. The ALJ provided that Dr. Welch's findings "fail to support Ms. O'Neill's assertion that the claimant has no functional use of the left hand." Id. In addition, the ALJ found Ms. O'Neill's findings regarding plaintiff's left hand/arm to contradict plaintiff's testimony that he "assists his nephew at an automotive garage for a few hours per day." Id. The ALJ observed that plaintiff

> reported this to Ms. O'Neill in July 2014. The restrictions identified by Ms. O'Neill would certainly preclude the claimant from assisting his nephew with tasks in an automotive garage, where the use of torque wrenches, air-guns, vise grips and jacks is routine. There are few activities performed in an automotive garage, which are performed at the highly restricted range of sedentary work described by Ms. O'Neill.

Id. The ALJ concluded that Ms. O'Neill's opined limitations "are grossly inconsistent with evidence of record." Id. The ALJ noted that "Dr. Cloninger, a medical expert,

---

[9] Determinations on whether a claimant is disabled – such as whether he can complete any work – is reserved to the Commissioner. 20 C.F.R. § 416.927(d)(1); see generally SSR 96-5p, 1996 WL 374183, at *6 (SSA 1996).

testified that he could not support Ms. O'Neill's conclusion, based upon his own review of the medical record." Id. Thus, the ALJ provided a detailed review of Ms. O'Neill's opinion and concluded that the medical opinions and objective medical evidence of record did not support the substantial limitations suggested by Ms. O'Neill. Accordingly, the Court finds that the ALJ did not commit error in according no weight to Ms. O'Neill's findings based on the record before him as the significant limitations she opined were not supported by substantial evidence the record.[10]

 

      b. **Compliance with Remand Order: Christine O'Neill, MMS, PA-C**

      Following the 2013 ALJ decision, the Appeals Council remanded plaintiff's case to the ALJ. T at 170-73. In the first decision, the ALJ determined that plaintiff had the RFC to:

> perform a full range of sedentary work but that he must avoid vibrations, unprotected heights, heavy moving mechanical parts, repetitive twisting, and bending. He should avoid balancing and climbing of ladders, ropes, or scaffolds. He was unable to perform jobs that require fine visual acuity. Finally, the claimant is limited to frequent but not continuous or repetitive handling and occasional feeling with the left hand.

Id. at 171. Further, the ALJ had accorded "great weight" to Ms. O'Neill's opinion "with the exceptions that the claimant required unscheduled breaks, the option to alternate between sitting and standing at will, and that he likely will be absent from work more

---

[10] Plaintiff also suggests that the ALJ erred in discounting Ms. O'Neill's opinions as to plaintiff's limitations in part because plaintiff's statement regarding his activities of daily living support far greater abilities than those opined by Ms. O'Neill. The ALJ's credibility assessment is discussed below.

than four days per month." Id. at 172.

The Appeals Council provided that, on remand, the ALJ "will"

> [o]btain additional evidence concerning the claimant's impairments in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence (20 CFR 404.1512-1513 and 416.912-913). The additional evidence may include, if warranted and available, an appropriate physical consultative examination and medical source statement about what the claimant can still do despite the impairments.

> Give further consider to claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations (20 CFR 404.1545 and 416.945 and Social Security Ruling 85-16 and 96-8p). In doing so, give further consideration to the nonmedical source opinion of Christine O'Neill, MMSC, PA-C, pursuant to the provisions of Social Security Ruling 06-3p, and explain the weight given to such opinion evidence.

> Obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Ruling 83-14). The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 404.1566 and 416.966). Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).

> In compliance with the above, the Administrative Law Judge will offer the claimant an opportunity for a hearing, take any further action needed to complete the administrative record and issue a new decision.

17

Id. at 172-73.

The Appeals Council specifically noted that the ALJ's prior decision did not discuss the following "additional limitations cited by Ms. O'Neill[,]" "and there is no rationale as to why they were omitted" in the ALJ's RFC.  T at 172.  These additional limitations were Ms. O'Neill's conclusions that (1) plaintiff had zero percent use of his left hand/arm, (2) plaintiff was limited to only occasional stooping and neck movements, and (3) plaintiff's symptoms would frequently interfere with his ability to perform simple work tasks.  Id.  Further, the Appeals Council appears to indicate that the ALJ was to define his finding that plaintiff could engage in "repetitive" twisting and bending.  Id. Plaintiff argues that the ALJ committed a number of errors on remand by failing to comply with the remand order.  Dkt. No. 12 at 26.  The Court finds that the ALJ complied with portions of the remand order as it relates to Ms. O'Neill insofar as he "gave further consideration" to Ms. O'Neill's opinion as to certain of plaintiff's abilities, but that the ALJ did not fully comply with all of the factors the Appeals Council directed him to address.  T at 172.

The Appeals Council indicated that the ALJ was to explain his assessment and consideration of Ms. O'Neill's findings that plaintiff had no functional use of his left arm and hand, was limited to occasional stooping and neck movements, that his symptoms would frequently interfere with his attention and concentration, and that plaintiff could engage in repetitive twisting and bending.  T at 182.  Addressing first limitations on plaintiff's use of his left arm/hand/fingers, the ALJ discussed in detail how Ms. O'Neill's treatment notes, and the other medical evidence in the record, did not support her

finding that plaintiff had no use of his left arm/hand. Id. at 21. The ALJ provided that plaintiff testified that he is able to help his nephew in his automotive garage, which he suggested was indicative of at least some ability to use his left hand, arm, and fingers. Id. at 22. Further, the ALJ observed that plaintiff's doctor, Dr. DeMuro, provided that plaintiff displayed "good motor skills," and had only "some difficulty" with fine motor skills in his left hand. Id. at 20. The ALJ addressed that consultative examiner, Dr. Welch, observed that plaintiff had nearly full strength (4/5) in all of his extremities. Id. at 17. Thus, the Court finds that the ALJ complied with the remand order to the extent he fully explained his reasoning for rejecting Ms. O'Neill's finding that plaintiff had no use of his left arm, hand, or fingers.

The ALJ also explicitly discussed plaintiff's vision issues, noting that Dr. Aitken, plaintiff's ophthalmologist, concluded that plaintiff's diplopia had resolved; that Dr. Adler, the consultative ophthalmologist provided that plaintiff's best corrected visual acuity was 20/25; and that Dr. Mark Gorman, plaintiff's neurologist, provided that plaintiff's visual fields were full to confrontation. T at 20, 22. Further, the ALJ noted that plaintiff did not require prism glasses. Id. at 22. Thus, the ALJ complied with the remand order insofar as he adequately discussed his findings regarding plaintiff's vision abilities and he properly referred to the medical evidence he relied on to support these findings.

Although the Court determines that the ALJ complied with the remand order regarding his discussion of plaintiff's use of his left arm, hand, and fingers, as well as his vision, the Court finds otherwise regarding the ALJ's discussion of Ms. O'Neill's opinion about plaintiff's ability to maintain attention and concentration. The ALJ rejected Ms.

19

O'Neill's findings relating plaintiff's ability to maintain attention and concentration because there "appears to be no clinical support for that statement in the medical evidence of record."  T at 19.  The ALJ observed that Dr. Welch "report[ed] that [plaintiff] remains cognitively intact," and that Dr. DeMuro "identif[ied] no deficits in concentration or attention."  Id.  Thus, the ALJ concluded that "[t]here is no evidence that [plaintiff] experiences deficits in attention, concentration, pace and persistence as the result of psychologically mediated factors."  Id.  However, the Court observes that Ms. O'Neill's RFC response regarding plaintiff's inability to maintain attention and concentration to perform simple work related to his pain and symptoms, and not necessarily to psychiatric conditions.  Id. at 909.  Indeed, the ALJ discussed limitations on attention and concentration in the portion of his decision addressing mental impairments, and did not address whether plaintiff's physical symptoms could cause attention and concentration problems.  Id. at 18-19.  Thus, the ALJ failed to comply with the remand order insofar as he did not appropriately interpret Ms. O'Neill's findings relating to plaintiff's attention and concentration, and, thus, did not address whether plaintiff's *physical* symptoms could interfere with his ability to perform basic work activities.

Further, the Court observes that the ALJ failed to explain what "repetitive" twisting and bending meant, as he was directed by the Appeals Council, yet the ALJ again included this finding in plaintiff's RFC.  T at 19, 192.  The ALJ also did not discuss his rationale for rejecting Ms. O'Neill's finding which limited plaintiff to "occasional stooping" or her conclusion that plaintiff had "limitations regarding neck movements."  Id. at 172.

Accordingly, although the ALJ did comply with portions of the remand order insofar as he explained some of his opined limitations, he did not comply with the remand order insofar as he failed to (1) address his reasons for rejecting Ms. O'Neill's findings relating to plaintiff's (a) ability to maintain attention and concentration due to his physical symptoms, (b) engage in only "occasional" stooping, and (c) limitations on neck movements; and (2) define his findings relating plaintiff's ability to engage in "repetitive" twisting and bending. On remand, should the Commissioner determine that the above limitations still apply, there must be a clear discussion of these limitations and reference to the evidence on which they are based.

### 2. Dr. Kenneth Cloninger, Medical Expert

### a. Compliance with Remand Order:
### Failure to Obtain Consultative Exam/Medical Source Statement

Plaintiff contends that the ALJ violated the Appeals Council's December 3, 2014 remand order "by not obtaining additional evidence concerning Mr. Hance's impairment," specifically "a consultative neurological exam" and a "medical source statement." T at 23. As for the latter, plaintiff argues that because the ALJ declined to "credit the treating physician's assistant, she should have asked Mr. Hance's representative to obtain a medical source statement from a doctor on the treating neurointerventional radiology team." Id. at 24. Defendant argues that the ALJ complied with the remand order insofar as he obtained the opinion of a medical expert, Dr. Kenneth Cloninger, a Board-certified neurosurgeon who testified at the hearing, a choice that was within his discretion. Dkt. No. 14 at 14.

At the April 29, 2015 hearing, Dr. Cloninger testified that he reviewed the medical record in detail, and went through plaintiff's medical history on the record. T at 60-66. He testified that he had been in private practice as a neurosurgeon for thirty-seven years, and is currently retired. Id. at 68.[11] Dr. Cloninger reviewed the medical source statement of Christine O'Neill, PA-C, plaintiff's treating physician's assistant, and opined that he would "give this PA less weight than the neurologist[12] that verified the question posed." Id. at 66. Dr. Cloninger elaborated that plaintiff "does have some problems, but . . . the balance seems to be the main problem[.]" Id. Addressing Ms. O'Neill's opinion that plaintiff would be unable to grasp, turn, or twist objects, or perform any fine manipulation, or reach with the left upper extremity," Dr. Cloninger indicated that there was nothing in the record that would support limitations "to that degree." Id. at 66-67. Dr. Cloninger further testified that he did not believe that plaintiff's conditions met any of the listings for a neurological condition. Id. at 67. He testified that he had treated "many" patients with "similar conditions" to plaintiff. Id. at 69. In response to a question by plaintiff's attorney asking whether it would be possible that plaintiff's recoiling in June 2012 "caused some additional double vision for Mr. Hance," Dr. Cloninger indicated that he "doubt[ed] it." Id. at 73-74. He acknowledged that Ms. O'Neill indicated that plaintiff

---

[11] Insofar as plaintiff appears to argue that Dr. Cloninger is not qualified, in part because he is retired from the practice of medicine or because of his age, the Court agrees with defendant's arguments on this point. Dkt. No. 12 at 30, 32. Plaintiff's counsel at the hearing level did not object to Dr. Cloninger's qualifications. T at 57. Furthermore, Dr. Cloninger practiced neurosurgery for over forty years. Plaintiff's apparent arguments that Dr. Cloninger should have been given less weight due to his age or the fact that he is retired active from practice are arguments this Court rejects, as Dr. Cloninger's age or the fact that he is retired – yet still board-certified – does not determine whether he is qualified to give a medical opinion or if his opinion should be given greater or less weight.

[12] The Court is unsure whether Dr. Cloninger was referring to the consultative neurologist, Dr. David Welch, or plaintiff's neurologist Dr. Mark J. Gorman.

experienced double vision in July 2014, but contended that he felt the ophthalmologist who stated that plaintiff's vision problems had resolved by April 2012, was "much more credible . . . than a PA . . . in a physician's office." Id. at 71-74.  Further, Dr. Cloninger testified that, after plaintiff underwent his second recoiling in June 2012, "as far as [he could] tell, there was no sequelae from the second coiling." Id. at 75.

Plaintiff appears to argue that, in obtaining the testimony of Dr. Cloninger, the ALJ did not comply with the remand order because be the ALJ should have obtained a consultative examination or a medical source statement from one of plaintiff's treating doctors.  Dkt. No. 12 at 24-26. The remand order did not direct the ALJ to obtain a consultative examination, rather it ordered the ALJ to "[o]btain additional evidence concerning the claimant's impairments" which "*may* include, if warranted and available, an appropriate physical consultative examination and medical source statement about what the claimant can still do despite the impairments." T at 172.  The Court finds that the ALJ should have obtained an examination or medical source statement because, upon rejecting Ms. O'Neill's RFC, the evidence of record did not suffice to support the ALJ's RFC.

The Court observes that the only RFC in the record before the ALJ other than Ms. O'Neill's is from non-examining Single Decision Maker ("SDM") R. Kalher.  T at 652. Although Dr. Cloninger and SDM R. Kahler do address plaintiff's limitations, they are based on a review of the records, and a rejection of the only function-by-function assessment in the record.   Although there are treatment notes from various treating providers and consultative examiners, none of them provided a statement of plaintiff's

specific abilities and limitations.  Beyond the MSS from Ms. O'Neill from September 2013, the medical evidence the ALJ considered regarding plaintiff's abilities and limitations include a neurology examination with Dr. David Welch, which occurred on May 9, 2012.  T at 627-28.  Dr. Welch noted that plaintiff had a "slightly wide-based gait pattern and does slightly favor his left lower extremity."  Id. at 628.  Plaintiff "had little difficulty balancing on the right foot but was not able to stand on the left for more than a couple of seconds."  Id.  Plaintiff's balance "became a significant issue" "when trying to walk in a tandem fashion."  Id.  Plaintiff could walk on his toes and heels.  Id.  Plaintiff had "good strength" in all extremities, "close to 4/5."  Id.  His reflexes on his left side were "slightly hyperactive but without any evidence of clonus[,] reflexes on the right are normal."  Dr. Welch found "no evidence of significant sensory deficits."  Id.  Plaintiff had "very slight facial weakness left side more than right but his movements were symmetrical."  Id.  Plaintiff had "some difficulty with right-sided gaze otherwise extraocular eye movements are normal."  Id.  Plaintiff further "demonstrated good gross motor coordination skills but had a little bit of difficulty with fine motor skills in the left hand more than the right."  Id. at 628.  Dr. Welch noted that plaintiff was "making a good recovery," but because his MRI "shows evidence of another aneurysm and a possible recurrence of the first" which "likely" indicated "additional surgical intervention," it was "premature to make a final determination about [plaintiff's] abilities going forward and a follow-up assessment or review of his medical records would be more appropriate in about 3 more months to make a more reasoned statement."  Id. at 828.

The ALJ also considered a consultative ophthalmology examination which

occurred on July 25, 2012 with Dr. Robert Adler, M.D.  T at 638-46.  Dr. Adler assessed

plaintiff's corrected visual acuity to be 20/25 in his right eye and 20/25 in his left eye.

Id. at 638.  Plaintiff's extraocular muscles were "normal."  Id.  His cornea and conjuctivia

"had Meesman's corneal dystrophy present" with which plaintiff was diagnosed in 1991.

Id.  Plaintiff's anterior chamber was "deep and clear."  Id.  He had "intraocular

pressures" of 16 in both eyes.  Id.  A "dilated fundus evaluation showed no retinal

pathology."  Id.

     The record before the ALJ also contained an examination by plaintiff's own

opthalmologist, Dr. Phil Aitken, M.D., from April 2012.  T at 616.  Plaintiff reported that

he was not experiencing diplopia.  Id.  Plaintiff had "decrease in abduction to the right,"

"[s]low saccades[13] to the right," and "slight ptosis."[14]  Id. at 617.  Dr. Aitken provided that

plaintiff's examination was "quite unremarkable."  Id. at 619.  Plaintiff's best corrected

visit was 20/25 and 20/30.  Beyond the "[d]ecreased sacaades to the right and what

appears to be a partial right VIth nerve palsy that is resolving," "the remainder of the

examination is unremarkable."  Id.  Dr. Aitken commented, "[i]nterestingly enough, when

I checked [plaintiff] in straight-ahead gaze, as well as right and left, I did not discern a

significant deviation."  Id.  Plaintiff had "a slight esophoria on far gaze right."  Id.  Dr.

Aitken summaries that plaintiff "has recovered very well following his stroke in terms of

the neuriopthalmic point of view."  Id.  Plaintiff's visual fields "were completely normal

---

[13]  Saccade is "a small rapid jerky movement of the eye especially as it jumps from fixation on one point to another (as in reading)."  https://www.merriam-webster.com/dictionary/saccade (last visited Mar. 10, 2017)

[14]  "Ptosis is a drooping of the upper eyelid."  https://www.aao.org/eye-health/diseases/what-is-ptosis (last visited Mar. 10, 2017).

without showing any evidence of pathology." <u>Id.</u>

The ALJ also considered a March 2013 treatment record from Dr. Mark J. Gorman, M.D. T at 17-18. As relevant here, plaintiff reported that "overall his vision has improved, but shifting his eyes from L to R is still a problem (he takes some time to fixate his vision when he does this)." T at 895. Plaintiff provided that he "needs to concentrate when he is walking and tends to stumble every now and then, especially when he is getting up in the morning." <u>Id.</u> Plaintiff provided that he is "very careful in the shower" and "unable to run." <u>Id.</u> Plaintiff told Dr. Gorman that he "can't feel his L hand/arm the same way as the R." <u>Id.</u> Plaintiff displayed full visual fields to confrontation. <u>Id.</u> at 897. His extraocular movements were intact with "some shakiness." <u>Id.</u> He had no facial motor or sensory asymmetry. <u>Id.</u> His hearing was intact. <u>Id.</u> He had no dysarthria.[15] <u>Id.</u> Plaintiff's strength was five out of five, "symmetrically without UE drift." <u>Id.</u> Plaintiff was "slow to activate" his left lower extremity. <u>Id.</u> Plaintiff's gait was "[w]ide-based" and "ataxic." <u>Id.</u> His sensation to light touch was in tact, except that it was "decreased" in the left upper extremity. <u>Id.</u> Plaintiff had left-sided dysmetria. <u>Id.</u> Dr. Gorman suggested that plaintiff "start to work at his recovery like it was a job," and suggested that plaintiff use a stationary bike, stationary rowing machine, or treadmill, as well as practice "tracing from L to R and R to L." <u>Id.</u>

As the review above demonstrates, none of these examining physicians provided a medical source statement or otherwise set forth a comprehensive assessment of

---

[15] Dysathria is an "[i]nability to articulate words correctly, with slurring and inappropriate phrasing." THE MERCK MANUAL OF DIAGNOSES AND THERAPY 1778 (19th ed. 2011).

plaintiff's functional abilities. As there is no function-by-function assessment in the record, beyond Ms. O'Neill's rejected RFC, the RFC of the non-examining SDM, and a very limited statement by nonexamining medical expert Dr. Cloninger, who discussed plaintiff's limitations only as it related to lifting abilities and a general conclusion that plaintiff could perform gross and dexterous movements. T at 19. Although he provided that plaintiff is able to walk without assistance, he did not assess limitations on plaintiff's ability to walk, sit or stand. Id. Thus, Dr. Cloninger's opinion, which also did not set forth a full function by function assessment, was insufficient to support the abilities and limitations the ALJ reached in his RFC. As the ALJ did not even discuss the opinion of the SDM, who, as a non-medical, non-examining source is not entitled to any evidentiary weight anyway, it does not appear this opinion was relied on in making the RFC findings. Although the ALJ is "free to resolve issues of credibility as to lay testimony or two choose between properly submitted medical opinions," he "cannot arbitrarily substitute his own judgment for competent medical opinion." Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998). "Without the advice of such a medical source, the ALJ, as a layperson, cannot bridge the gap between [the plaintiff's] impairments and the functional limitations that flow from those impairments." Hernandez v. Commissioner of Soc. Sec., 13-CV-959 (GLS/ESH), 2015 WL 257819, at *2 (N.D.N.Y. Jan. 22, 2015) (citing Dailey v. Astrue, No. 09-CV-0099, 2010 WL 4703599, at *11 (W.D.N.Y. Oct. 26, 2010)). Thus, Court agrees with plaintiff that, based on the record before the ALJ, there was no statement from an acceptable medical source providing a function-by-function assessment of plaintiff's abilities, and, thus, the record contained a

gap, which triggered the ALJ's duty to develop the record. The Court is unable to find

that the RFC determination is supported by substantial evidence. Thus, in this instance,

compliance with the Appeals Council order required obtaining additional evidence,

either in the form of a consultative examination or medical source statement, in order to

have a complete record to make an RFC determination. Accordingly, on remand,

should Ms. O'Neill's opinion again be rejected, the Commissioner is to ensure that

additional evidence is obtained that can support a full evaluation of plaintiff's function-

by-function abilities and limitations.


### b. Weight Given to Dr. Kenneth Cloninger's Opinion

Plaintiff argues that the ALJ erred in according great weight to the opinion of

nonexamining medical expert, Dr. Kenneth Cloninger, who testified at the April 2015

hearing. Dkt. No. 12 at 26. Dr. Cloninger concluded that, based on his review of the

record, plaintiff does not suffer from an impairment of the severity of a listing. T at 67.

Dr. Cloninger opined that plaintiff's "primary" or "main" "problem seems to be balance."

Id. at 64-66. He provided that plaintiff should avoid unprotected heights and must have

a handrail to use stairs. Id. Dr. Cloninger also provided that plaintiff could lift ten

pounds frequently, and twenty pounds occasionally. Id. at 65. Dr. Cloninger noted that

Ms. O'Neill provided a medical source statement, "but it was done by a physician's

assistant." Id. at 65. Dr. Cloninger noted that Ms. O'Neill reported that plaintiff had

double vision, but that her opinion conflicted with the "ophthalmology evaluation." Id. at

66. He provided that he would accord the an ophthalmologist's opinion more weight

than Ms. O'Neill's, as the ophthalmologist is specifically trained regarding vision.  Id. at

74.  Dr. Cloninger also noted that he would accord Ms. O'Neill's opinion, as a PA, less

weight than the neurologist's opinion.  Id.  The ALJ accorded Dr. Cloninger's opinion

"great weight."  Id. at 23.

"It is well settled that an ALJ is entitled to rely upon the opinions of both

examining and non-examining State agency medical consultants, since such

consultants are deemed to be qualified experts in the field of social security disability."

House v. Comm'r of Soc. Sec., 32 F. Supp. 3d 138, 151-52 (N.D.N.Y. 2012).  However,

"a non-examining source's opinion, including the opinions of state agency medical

consultants and medical experts, will generally be given less weight than an examining

source's opinion."  Schmelzle v. Astrue, 6:07-CV-931 (NAM), 2010 WL 3522305, at *2

(citing 20 C.F.R. 404.1527(d)(1)).  Indeed, such an opinion, without more, is

"'insufficient to constitute the requisite contrary substantial evidence' to override the

diagnosis of a treating physician.'"  Id. (quoting Garzona v. Apfel, 96-CV-6249, 1998 WL

643645, at *1 (E.D.N.Y. Sept. 18, 1998)).

Insofar as plaintiff argues that Dr. Cloninger "erred in discrediting PA O'Neill just

because he did not know how well she was trained," and, thus, the ALJ erred by relying

on Dr. Cloninger's opinion, the Court is unmoved by this argument.  Dkt. No. 12 at 33.

To the extent plaintiff argues that Dr. Cloninger's opinion should be accorded less

weight because he accorded Ms. O'Neill's opinion less weight because he was unaware

of her training, the ALJ is the one who assesses credibility, not Dr. Cloninger.  Even

though the ALJ gave great weight to Dr. Cloninger's opinion, it does not mean he

adopted Dr. Cloninger's findings insofar as it related to Dr. Cloninger's assessment of

Ms. O'Neill's opinion.  Regardless, it is entirely within the ALJ's abilities to accord

greater weight to a physician – an acceptable medical source, especially one who gave

an opinion about a field in which he specializes, here, ophthalmology – than to an

unacceptable medical source.  However, because, as indicated above, the Court finds

that there was insufficient evidence in the record to support the ALJ's RFC, the Court

declines to address whether the ALJ's decision to accord Dr. Cloninger's opinion great

weight was proper.  Accordingly, on remand, should the Commissioner choose to rely

on Dr. Cloninger's testimony, an explanation as to how the medical expert's testimony is

consistent with a well-supported RFC should be provided.


### 3. Credibility

Plaintiff contends that the ALJ erred in his assessment of his credibility for

several reasons.  First, he argues that the ALJ erroneously failed to consider his good

work history.  Dkt. No. 12 at 43.  Second, plaintiff argues that the ALJ erred insofar as

he did not consider plaintiff's September 11, 2013 hearing testimony that he did not

perform work on cars while he visited his nephew.  Id. at 42.  Finally, he argues that the

Appeals Council committed error insofar as it failed to consider the additional evidence

which would contradict the ALJ's findings that plaintiff is less credible due to (1) his

failure to quit smoking, (2) his refusal to follow treatment advice, and (3) evidence that

he was able to work on cars.  Id. at 44.

First, although it appears true that plaintiff had a good work history, and "'a good

work history may be deemed probative of credibility,' it remains 'just one of many factors' appropriately considered in assessing credibility.'" Campbell v. Astrue, 465 F. App'x 4, 6 (2d Cir. 2012) (quoting Schaal v. Apfel, 134 F.3d 496, 502 (2d Cir. 1998)). Thus, an ALJ's decision not to "exclusively rely" or even "specifically reference" a claimant's good work history is not reversible error. Id. (citing Wavercak v. Astrue, 420 F. App'x 91, 94 (2d Cir. 2011). Therefore, the ALJ did not commit legal error by declining to address plaintiff's positive work history.

Plaintiff argues that the ALJ erred in making his credibility assessment because he did not address the apparent conflict between plaintiff's testimony in the first hearing, wherein he testified that he did not perform work on cars, T at 134-35, and Ms. O'Neill's treatment notes wherein she indicates that plaintiff reported during a July 8, 2013 visit that he was "going to his nephew's garage to help him work on cars" and that he "helped" his nephew at the garage during his July 4, 2014 visit. Id. at 902, 931.[16] An ALJ's "determination of a witness' credibility is entitled to great deference by reviewing courts, but the ALJ must first articulate what her determination was and the basis for it." Arias v. Astrue, 11 Civ. 1614, 2012 WL 6705873, at *2 (S.D.N.Y. Dec. 21, 2012). Thus, "[i]f the ALJ detected an inconsistency in the claimant's testimony, it was [his or] her duty to ask about the inconsistency "'rather than simply snap the trap closed in his written decision.'" Id. (quoting Fox v. Astrue, 06 Civ. 1599, 2008 WL 828078, at *12

---

[16]     Plaintiff testified: "My nephew works right across the driveway, so . . . I'll go over and then sit down over there an just kind of, you know, keep him company during the day." T at 134. He testified that he does not "help out" his nephew, such as by handing him tools; instead, he is "just sitting there" in a chair and does not do anything else. Id. at 135-36. Further, plaintiff testified that he spends three to four hours a day with his nephew, but that this period is usually broken up throughout the day. Id. at 136.

(N.D.N.Y. Mar. 26, 2008) and citing <u>Matejka v. Barnhart</u>, 386 F. Supp. 2d 198, 206

(W.D.N.Y. 2005) and <u>Fernandez v. Apfel</u>, No. 98-CV-6194 (JG), 2000 WL 271967, at *8

(E.D.N.Y. Mar. 7, 2000)).

Here, although there are two treatment notes from Ms. O'Neill where she

indicates that plaintiff reported visiting his nephew and working on cars, the ALJ did not

address the fact that plaintiff testified in September 2013, that he visited his nephew but

did not perform any work on cars during his visits.  Although the September 11, 2013

hearing transcript was included in the record before the ALJ, the Court is unable to

determine whether this testimony was considered because the ALJ made no reference

to this testimony, even though it creates an inconsistency in the record.  Review of the

ALJ's decision makes clear that the ALJ relied heavily on the apparent belief that

plaintiff was working on cars in his nephew's garage in assessing both plaintiff's

credibility and in determining the weight to accord to Ms. O'Neill's opinion.  T at 21.[17]

Prior to substantially reducing plaintiff's credibility and the weight accorded to Ms.

O'Neill's opinion, the ALJ should have addressed the inconsistency in the record and

explained whether he was according any weight to plaintiff's testimony that he did not

---

[17]  The ALJ provided:

> Ms. O'Neill's opined restrictions on plaintiff's ability to lift, grasp, reach,
> and turn objects is "inconsistent with the claiamnt's statement that he
> assists his nephew at an automotive agrage for a few hours per day . . . .
> The restrictions identified by Ms. O'Neill would certainly preclude the
> claimant from assisting his nephew with tasts in an automotive garage,
> where the use of torque wrenches, air-guns, vise grips, and jacks is
> routine.  There are very few activities performed in an automotive garage,
> which are performed at the highly restricted range of sedentary work
> described by Ms. O'Neill.

T at 21.

perform work in the garage.  Indeed, it is possible that Ms. O'Neill misunderstood plaintiff's statements regarding his nephew's automotive garage and what he did there.

Accordingly, insofar the ALJ reduced significantly plaintiff's credibility based on his reliance on the statements reported in Ms. O'Neill's treatment notes regarding plaintiff "helping out" or "working" in his nephew's garage, the ALJ's credibility determination is not supported by substantial evidence because it does not address the inconsistency presented by plaintiff's hearing testimony that he did not perform work in the garage.  Arias, 2012 WL 6705873, at *2.  Therefore, on remand, any consideration of plaintiff's credibility based on the statements in Ms. O'Neill's July 2013 and July 2014 treatment notes regarding plaintiff's apparent work in a garage must be considered with plaintiff's September 2013 hearing  testimony.

Plaintiff argues that the ALJ erred in failing to consider the additional evidence he submitted, and, thus, erred by failing to reconsider the ALJ's credibility assessment. Plaintiff submitted to the Appeals Council Ms. O'Neill's July 2, 2015 treatment note.  In this treatment note, Ms. O'Neill provides that plaintiff reported that plaintiff (1) "wants to clarify that in the past when he said he helped his nephew in the garage, he was not actually performing any work," (2) "is clear that he has taken aspirin 325 daily since I saw him last in July, and (3) managed to cut down to cigarette use to one half pack daily.  T at 946.

Although the Court finds that the ALJ erred insofar as he failed to address the apparent discrepancy between plaintiff's testimony and Ms. O'Neill's July 2013 and July 2014 treatment notes, the Court does not find that the ALJ committed any error insofar

as it declined to consider Ms. O'Neill's July 2015 treatment record wherein plaintiff "clarifies" that he did not perform work at his nephew's garage, and just sat and talked with his nephew as an "opportunity to get out of the house", has been compliant with taking his aspirin since his visit with Ms. O'Neill in July 2014, and cut back to smoking one half of a pack per day.  T at 944.  As for the statement to Ms. O'Neill regarding work on cars, as discussed, the record already contains plaintiff's testimony regarding his position about working in his nephew's garage. T at 134-35.  Thus, the post-hearing report to Ms. O'Neill is unnecessary as it is redundant.  Regardless, as the ALJ improperly failed to consider the September 2013 testimony, which was necessary for an accurate assessment of plaintiff's credibility, in assessing the plaintiff's credibility on remand, the Commissioner may consider the additional evidence insofar as plaintiff's clarifying statement to Ms. O'Neill during his July 2015 appointment.

As for plaintiff's July 2015 statement to Ms. O'Neill that he had been compliant with aspirin for a year, even if it is the case that plaintiff belatedly complied with taking aspirin, it was within the ALJ's purview to consider the fact that, at several medical visits, plaintiff indicated noncompliance with aspirin.  There were several instances in the medical record that showed that plaintiff was non compliant with his treatment regimen.  Thus, the ALJ did not commit error in considering the fact that plaintiff was non compliant with his aspirin in assessing his credibility.  However, as a new credibility assessment must be made, the ALJ may consider plaintiff's statement to Ms. O'Neill in assessing plaintiff's compliance with medical recommendations.

Finally, insofar as plaintiff contends that the Appeals Council should have

considered the new evidence insofar as plaintiff indicates to Ms. O'Neill in the July 2015 treatment note that he cut down on smoking, even if plaintiff cut down on his smoking, there is substantial evidence in the record that plaintiff failed to comply with many medical professionals' recommendations to quit smoking. T at 922, 931. Further, the Court observes that, although plaintiff reported to Ms. O'Neill during the July 2015 visit that he "cut down cigarette use to one half pack daily," he was reported to be smoking a half of a pack per day back in July 2014. T at 931, 946. Thus, this record does not necessarily demonstrate that plaintiff reduced his degree of smoking by July 2015. In sum, the Court finds that the Appeals Council did not commit error as it relates to declining to consider the July 2015 treatment note insofar as it relates to consideration of plaintiff's report to Ms. O'Neill that he had been cutting back on smoking.

### 4. Consideration of New Evidence

Plaintiff argues that the Appeals Council erred by not considering a June 11, 2015 treatment note from Dr. Joseph Rini, Ophthalmologist; PA O'Neill's treatment note dated July 2, 2015; and a RFC assessment from Dr. Linnell dated July 31, 2015. Dkt. No. 12 at 34. Plaintiff's counsel submitted these documents following the issuance of the ALJ's June 1, 2015 determination.[18] Plaintiff suggests that the information submitted to the Appeals Council demonstrates that plaintiff's condition worsened. Defendant contends that the additional evidence plaintiff provided to the Appeals

---

[18] The Second Circuit has made clear "that medical evidence generated after an ALJ's decision cannot be deemed irrelevant solely because of timing." Newbury v. Astrue, 321 F. App'x 16, 18 n.3 (2d Cir. 2009) (summary order) (citing Pollard v. Halter, 377 F.3d 183, 193 (2d Cir. 2004)).

Council "duplicates Ms. O'Neill's prior opinion, is inconsistent with and unsupported by substantial evidence in the record, and provides no basis for disturbing the ALJ's decision." Dkt. No. 14 at 18. The Court finds that the Appeals Council erred in declining to consider the additional evidence for the reasons stated below.

Most significant to the Court is Ms. O'Neill's July 2, 2015 treatment note. Ms. O'Neill performed a physical examination where she observes rotary nystagmus in plaintiff's left eye, bilateral ocular ataxia for several seconds following any change in eye position, upper extremity dysmetria[19] and dysdiadochkinesia,[20] severe gait abnormality, and that, while walking, plaintiff ran his right hand against wall and needed to hold ex-wife's arm when the wall ended. Id. at 945. Also in the treatment note, Ms. O'Neill details Dr. Johnson's impressions of an MR Angio head taken on July 2, 2015. Id. She indicates that Dr. Johnson reviewed the July 2015 imaging study, compared it with a September 2014 imaging study,[21] and found "increased volume" and a "more prominent" small infarct in the right aspect of the pins. Id. Ms. O'Neill indicated that this finding was "very concerning" and she provided that she "suspect[s] this correlates with his worsened neurologic exam." Id.

---

[19] Dysmetria is the "[i]nability to control range of movement." THE MERCK MANUAL OF DIAGNOSES AND THERAPY 1778 (19th ed. 2011).

[20] Dysdiadochokinesia is an "[i]nability to perform rapid eye movements." THE MERCK MANUAL OF DIAGNOSES AND THERAPY 1778 (19th ed. 2011).

[21] Although the ALJ did not discus the 2014 hospitalization and MRI, it appears that some treatment records addressing the 2014 hospitalization and MRI were included in the record before the ALJ. T at 30 (setting forth exhibits included in hearing record before ALJ, includes exhibit 24 F and 25F, defined as "Office Treatment Records" from Dr. Robert DeMuro 9/9/13-12/3/15 and Office Treatment Records from Ms. O'Neill from July 4, 2014); 919-28; 930-35.

Although the record before the ALJ contained the 2014 MRA,[22] Ms. O'Neill, via Dr. Johnson, opines that plaintiff's MRI from July 2015 shows "very concerning" changes from the September 2014 MRA. T at 946. Specifically, Ms. O'Neill reports that the July 2015 MRA reveals that there exists a "small infarct in right aspect of the pons is more prominent on T1 sequence than it was on prior MR." Id. She provides that there is "[i]ncreased volume loss there now" which "is very concerning," and that she "suspect[s] this correlates with his worsened neurologic exam." Id.

The Court finds that the evidence submitted to the appeals council, specifically Ms. O'Neill's July 2015 treatment note, is both new and relevant. The evidence provided is not, as defendant suggests, cumulative as the evidence suggests that there has been a worsening of plaintiff's condition. Although the evidence is from after the ALJ's decision was issued, it is occurred just one month later. Thus, it is reasonable for the Court to assume that any conditions that may have existed in July 2015 existed one month earlier, in June 2015, when the ALJ issued his decision. This appears to differ from a situation where the plaintiff's condition worsened long after the ALJ's decision, as it would appear unlikely that plaintiff's condition would be significantly different just one month after issuance of the ALJ's decision. Cf. Perez v. Barnhart, 234 F. Supp. 2d 336, 342 (S.D.N.Y. 2002).

Additionally, plaintiff submits an RFC that appears to be completed by Dr. Johnson and Ms. O'Neill, wherein the providers set forth even more significant

---

[22] MRA is an abbreviation for magnetic resonance angiogram. An MRA "is used to assess blood volumes of interest (eg, blood vessels in the chest or abdomen); all blood flow can be assessed simultaneously. MRA can be used to detect aneurysms, stenosis, or occlusions in the carotid, coronary, renal, or peripheral arteries." THE MERCK MANUAL OF DIAGNOSES AND THERAPY 2059 (19th ed. 2011).

limitations than those opined in Ms. O'Neill's September 2013 RFC. As Ms. O'Neill's July 2015 treatment note may indicate that plaintiff's condition worsened, consideration of the July 31, 2015 RFC is not duplicitous of Ms. O'Neill's September 2013 RFC because it may represent a review of plaintiff's "worsened" limitations. Similarly, consideration of June 11, 2015 treatment note from plaintiff's opthalmologist Dr. Rini should also have been considered, as it may be reflective of whether plaintiff's condition worsened. T at 938.

This information was not available at the time of the ALJ proceedings, but was included in the decision by the Appeals Council. Accordingly, this information may be reviewed by the ALJ on remand. See Mendez ex rel. E.V. v. Astrue, No. 11-CV-4297 (KAM), 2013 WL 1686485, at *9 (E.D.N.Y. Apr. 18, 2013) (citing Carballo ex rel Cortes v. Apfel, 34 F. Supp.2d 208, 223 (S.D.N.Y. 1999)). Further, on remand, should the Commissioner determine that a new evaluation by an ALJ is necessary, such evaluation should include consideration of Ms. O'Neill's July 2015 treatment note, Dr. Rini's June 2015 treatment note, and Dr. Johnson and Ms. O'Neill's July 2015 RFC. Further, should the Commissioner deem it necessary, additional evidence regarding plaintiff's condition, including, if warranted, a consultative examination, may be obtained.[23]

### III. Conclusion

---

[23] Plaintiff also argued that the ALJ committed reversible error insofar as he failed to present to the Vocational Expert an accurate hypothetical reflective of plaintiff's abilities. As the Court finds that the matter must be remanded, it need not reach this argument. However, should it be deemed necessary on remand to contact a vocational expert regarding plaintiff's abilities, any hypothetical presented must include consideration of an RFC that takes into account both the updated assessment of plaintiff's credibility and inclusion of the new medical evidence.

Having reviewed the administrative transcript and the ALJ's findings, for the reasons stated herein, the undersigned concludes that the Commissioner's determination is not supported by substantial evidence.  First, should the Commissioner again conclude that Ms. O'Neill's opinion is not entitled to any weight, a complete explanation must be given regarding Ms. O'Neill's various findings, as detailed above. Supra at 16-21.  Second, as stated herein, the matter must be remanded for reconsideration of plaintiff's credibility insofar as it relates to his apparent work in his nephew's garage, as detailed herein.  Supra at 31-34.

Third, the Court finds that the Appeals Council erred in failing to consider the additional evidence submitted following issuance of the ALJ's determination as the evidence is both new and material and relevant to the period of time under review. Accordingly, on remand, the new evidence must be considered, and, if deemed necessary, additional evidence may be obtained.

Fourth, because the Court finds that, once the ALJ concluded that he was according no weight to Ms. O'Neill's RFC assessment, the record lacked a complete statement from an acceptable medical source that addressed plaintiff's function-by-function abilities.  Accordingly, on remand, unless the new evidence that was submitted to the Appeals Council and made a part of the administrative record is deemed sufficient in assessing plaintiff's RFC, the Commissioner is obtain, either through a consultative examination, medical source statement, or other appropriate means, a statement that addresses plaintiff's function-by-function abilities and limitations.

**WHEREFORE**, for the reasons stated above, it is hereby

**ORDERED,** that the Commissioner's motion for judgment on the pleadings (Dkt. No. 14) be **DENIED**, and it is further

**ORDERED**, that plaintiff's motion for judgment on the pleadings (Dkt. No. 12) be **GRANTED**, and that the Commissioner's decision denying disability benefits be **REMANDED**, pursuant to sentence four of 42 U.S.C. § 405(g), to the Commissioner for further proceedings consistent with Decision and Order; and it is

**ORDERED**, that copies of this Decision and Order be served on the parties.

**IT IS SO ORDERED.**

Dated: March 15, 2017
        Albany, New York

Christian F. Hummel
U.S. Magistrate Judge